## LEHIGH VALLEY R. CO. v. HUBEN.

(Circuit Court of Appeals, Second Circuit. November 2, 1925.)

No. 44.

**1. Master and servant ⊜⇒276(1)—Evidence held to show baggage master on train was engaged in interstate commerce.**

Evidence that mails for points without the state were nearly always carried on train on which baggage master was working at time of his death, and lack of affirmative showing to the contrary, *held* to show as matter of law that decedent was engaged in interstate commerce.

**2. Master and servant ⊜⇒267(1)—Evidence as to mail carried on train held admissible on question whether baggage master was engaged in interstate commerce.**

Testimony that mail for points without the state was nearly always dispatched on particular train *held* admissible on question whether baggage master on that train was engaged in interstate commerce at time of injury, though witnesses could not state positively that such class of mail was placed on train on particular day of injury.

Hough, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Action by Anna Huben, as administratrix of the goods, chattels, and credits of Michael Huben, deceased, against the Lehigh Valley Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Alexander & Green, of New York City (Clifton P. Williamson, and H. S. Ogden, both of New York City, of counsel), for plaintiff in error.

Humphrey J. Lynch, of New York City (Sol Gelb, of White Plains, N. Y., of counsel), for defendant in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This action was brought by plaintiff, as the administratrix of the estate of her deceased husband, to recover damages for his death, which it is alleged occurred while he was employed by the defendant and in interstate commerce. The suit is based upon the federal Employers' Liability Act (Comp. St. §§ 8657–8665), the Safety Appliance Act and the amendments thereto (Comp. St. § 8605 et seq.), and reliance is had upon the federal Boiler Inspection Act (Comp. St. § 8630 et seq.). These acts were fully considered by us in Lehigh Valley Railroad Co. v. Beltz, 10 F. (2d) 74, decided by this court this day. That case and this were argued together. In that case we held that the Boiler Inspection Act, like the Safety Appliance Act, imposed an absolute duty upon a common carrier engaged in interstate commerce to use only locomotives which are in all respects safe, and so far as that question arises in the present suit it is governed by our decision in the Beltz Case.

But we are confronted in this case with a question which did not arise in that case, and which must be disposed of in a separate opinion. Michael Huben, the administratrix's decedent, was employed at the time of his death by the Lehigh Valley Railroad as a baggage master, and at the time of the accident was in the performance of his duties in a baggage car of a passenger train of the railroad company standing at the station at Mt. Carmel, in the state of Pennsylvania. His train was about to depart, but as the conductor was starting to give the signal for its departure a collision occurred with the runaway engine, from which Beltz and the engineer and the fireman had been compelled to jump because of the escape of steam, hot water, and fire, as stated in the Beltz Case.

After these men jumped from the engine it continued down grade, and ran into the passenger train standing at the station, with the result that Huben received injuries which resulted in his death. There is no doubt as to the liability of defendant, if the man was at the time of his death actually engaged in interstate traffic.

The administratrix, the plaintiff herein and the wife of Huben, at the time of his death had been married to him for 17 years. During the entire period he was employed by the Lehigh Valley Railroad, first as a brakeman, and later as a baggage master. His wages were paid every two weeks by check, of between $70 and $80. This he always turned over to his wife, who made the purchases for the family and saved the balance. His health and habits were excellent. At the time of his death he had a daughter between 11 and 12 years of age, and 3 months after his death a son was born. The wife had no independent income, and neither did Huben.

At the end of the plaintiff's case, counsel for defendant moved to dismiss on the ground that she had not established the cause of action. The motion was predicated on the claim that there was no proof that at the time of his death Huben was employed in interstate commerce; and it was also predicated on the claim that no negligence on the part of the defendant was proven, and that without proof of negligence there was no liability imposed on defendant, either under the federal Employers' Liability Act, or under the Safety Appliance Act, or under the Boiler Inspection Act. But in the Beltz Case this court has decided that the acts of Congress impose an absolute duty upon carriers engaged in interstate commerce to maintain their locomotive engines, when in active service, in a safe condition, and that the liability of the carrier in the discharge of that duty does not depend upon its negligence.

[1] The only question, therefore, which it is necessary now to consider, is whether the plaintiff has established by sufficient evidence that Huben at the time of his death was engaged in interstate commerce. The District Judge held as a matter of law that the defendant's liability was absolute, and that the plaintiff was entitled to a verdict. The jury returned a verdict for plaintiff in the amount of $22,500, which was divided as follows: To the daughter Florence, 16 years old, $2,500; to the son Gerald, 4 years old, $5,000; to the wife, plaintiff herein, and 41 years old, $15,000.

Some attempt was made to show that at the time of the collision the passenger train, in the baggage car of which Huben was in charge, had on board passengers for points outside the state of Pennsylvania. But the

attempt was not successful. The conductor testified as follows:

"Q. Do you keep a record of the destination of the passengers that you had on that train? A. No.

"Q. If a passenger were going to New York, would you have a record of it? A. No, sir; I would not.

"Q. Do you recall whether or not, on the morning of November 15, 1920, there were any passengers on train No. 180 that were destined to any point outside of the state of Pennsylvania? A. I could not just tell you."

And if this action can be maintained, it must be on the ground that at the time the accident occurred the train was carrying mail for points outside the state of Pennsylvania.

Our attention was called at the argument to Erie Railroad Co. v. Russell, 183 F. 722, 106 C. C. A. 160. In that case the evidence was that an empty car with a defective coupler was brought into a station in an interstate train, left in the switchyards over night, and the next day was taken out on another interstate train. This court held that this empty car was being used in interstate commerce, not only while being moved in the trains, but also while in the yard. We fail to see the application of this holding to the question now under consideration. The question here is whether Huben, at the time the collision took place, was on a car carrying interstate mail. If it was not, Huben, at the time he met his death, was not employed in interstate traffic.

The proof which is relied upon to establish that Huben's employment was in interstate commerce depends on proof of the fact that, although the train was a regularly scheduled train running from Mt. Carmel, in Pennsylvania, to Mauch Chunk, in the same state, it customarily carried mail destined to points outside the state of Pennsylvania. The testimony relating to the carrying of the mail was as follows:

[2] A witness who was employed in the post office in Mt. Carmel, and was assistant postmaster at the time of the accident, who had served in that capacity for 3 years, and had been employed in the office about 23 years, testified that the train was a regular mail train carrying mail out of Mt. Carmel every day except Sunday. (The accident was not on Sunday.) He said the train "carried a pouch for New York, Geneva and Buffalo," and such pouches were due to go out every day. On cross-examination his testimony was:

"Q. Mr. Bensinger, you do not know of your own knowledge of any recollection, or from any record that you have seen, that any particular mail pouch left the Mt. Carmel post office for the Lehigh Valley train which was due to leave Mt. Carmel on the morning of November 15, 1920, at 7:05, do you? A. I could not swear to that.

"Q. And, of course, you have no recollection of your own as to what happened that far back? A. I do not know.

"Q. And you have no idea now whether there was on the train, at the time of the accident, any interstate commerce mail? A. I could not swear to that."

Thereupon counsel moved to strike out his direct testimony on the subject. The motion was denied and an exception taken.

Another witness, the mailing clerk, who had been employed in the office about 12 years, testified that during the whole of that period the particular train involved carried mail, and that mail pouches were due to go out on that train for New York, Geneva, and Buffalo. On his cross-examination he testified as follows:

"Q. Mr. Meyer, on the morning of November 15, 1920, you do not know whether you went to work in the post office at 6 or 11? A. I do not.

"Q. Consequently, you have no idea whether any mail pouches left the Mt. Carmel post office on that morning for the train which was to leave the Lehigh Valley depot at 7:05 o'clock, have you? A. I do not know.

"Q. And you certainly have no record that there were any mail pouches on the train in question at the time of the accident? A. No, sir."

It was then moved to strike out his direct testimony on the subject of custom and practice. The court denied the motion and an exception was granted.

A witness whose duty it was to take mail from the post office to the station testified that on the morning of the accident he took the mail bags to the station and put them in the baggage car of this particular train, and that among them was a mail pouch marked for New York, Geneva, and Buffalo. Then he was examined by the court as follows:

"Q. Do I understand that there was uniformly a New York pouch; there was always a New York pouch? A. Yes, sir; pretty near every day there was a New York pouch.

"Q. You say pretty nearly every day? A. Yes, sir.

"Q. Some day there was not? A. No, sir.

"Q. You do not know this day whether there was or not? You do not remember this day especially? A. No, sir.

"Q. You only know that it was the common thing that there should be a New York pouch on the 7:05 train? A. Yes, sir.

"Q. And if I have your testimony correctly, that is all you do know; is that right? A. Yes, sir."

Counsel then moved to strike out the witness' testimony on the subject of custom and practice at that time, as immaterial, irrelevant, and incompetent, and hearsay, as far as the day in question is concerned. The motion was denied and an exception allowed.

We think the testimony of these witnesses was admissible, and that no error was committed in denying the motions to strike out. Courts admit the probative value of a person's habit or custom as showing the doing on a specific occasion of an act which is the subject of the habit or custom. 1 Wigmore on Evidence, § 92. So evidence is admissible as to the usual and fixed course of business between two persons, to indicate the probable tenor of a particular transaction. See Howard v. Sheward, L. R. 2 C. P. 148; Plumb v. Curtis, 66 Conn. 154, 33 A. 998. The mere writing of a letter, addressing it and stamping it and depositing it in the post office, is sufficient to put upon the party addressed the burden of showing he never received it. Rosenthal v. Walker, 111 U. S. 185, 4 S. Ct. 382, 28 L. Ed. 395; Young v. Clapp, 147 Ill. 176, 32 N. E. 187, 35 N. E. 372; McDowell v. Insurance Co., 164 Mass. 444, 41 N. E. 665; State v. Howell, 61 N. J. Law, 142, 38 A. 748. And we think that, while the admissibility of testimony given in this case as to the custom of this train to carry interstate mail is somewhat different from the principle involved in the cases mentioned, it is nevertheless somewhat analogous, and that no error was committed in denying the motion to strike out.

It was proven that the train which regularly left Mt. Carmel at 7:05 a. m., and upon which the decedent was employed as baggage master, was accustomed to carry in the baggage car mail for points outside the state of Pennsylvania. But it is not shown by direct proof whether or not on the morning this accident happened such mail was actually on board the car. But it appears to us that the

evidence brings the case within the rule laid down in Pittsburgh, C., C. & St. Louis Railway Co. v. Glinn, 219 F. 149, 135 C. C. A. 46. In that case a brakeman working in the switching yards of a railway company was killed. The question was whether, at the time he met his death, he was actually employed in interstate commerce. Judge Denison, writing for the Circuit Court of Appeals, Sixth Circuit, said:

"Did the proof sufficiently tend to show that Morford was engaged in interstate commerce? At the moment, the switch engine was not hauling any cars, and so the true character of the employment can be determined only by a broader view. The evidence showed that the railway company, in and about these yards, was continuously and indiscriminately hauling intrastate and interstate freight, and that, in this part of the work, no distinction whatever was made between the two classes. Describing the work of this train crew, the yardmaster's clerk said that it handled both intrastate and interstate shipments, that it handled all classes and character of freight and all kinds of cars during its working hours, and that it did the work of transferring and putting into other trains everything that came in for transfer, making no difference or distinction. When it was sought to get the cards constituting the record which would show exactly what cars had been handled that night, counsel for the railroad said: 'We admit that, when these cards come in, they will show freight of every character and description; intrastate and interstate—both kinds.' In answer to the statement by plaintiff's counsel that he wished 'to show further that this character of interstate freight came in there and was handled by this train (crew) that night,' counsel for the railroad company admitted that at some time during that night this particular decedent had handled both intrastate and interstate freight, and that other freight of both kinds was coming in and going out of those yards, and that all the tracks down there were used for the handling of both. Upon this stipulation of fact, the trial proceeded."

Judge Denison then reviewed the cases, and concluded that "cases like the present are fairly within the line of validity. They hardly go beyond fixing the burden of proof and declaring that, where the facts show the case may well have been within the statute, the initial burden is satisfied, and it is for the defendant to show the contrary."

The question came before this court in 1916 in Erie R. Co. v. Krysienski, 238 F. 142, 151 C. C. A. 218. In that case the plaintiff worked as a laborer in the railroad company's machine and repair shop. In the shop, dirt and grease were removed from engine parts prior to repair work, by immersing the parts in a vat containing a hot fluid. The ·evidence showed that the man was injured by falling into the vat through the negligence of the railroad, and while engaged in inserting or removing, or otherwise handling, one or more of the engine parts then immersed, or about to be, in said hot fluid. The evidence did not render it possible to declare whether or not that particular engine part which the plaintiff below was handling at the time he was injured had been, or was again to be, used in interstate commerce. In order that the plaintiff could recover, it was necessary for the jury to find that he was at the time of his injury engaged in interstate commerce. The jury found in his favor, and on writ of error the case was brought into this court and the judgment was affirmed. In the opinion in that case Judge Hough, writing. for this court, said:

"When plaintiff below rested, there was evidence showing that some of the parts in the vat belonged to engines owned, used, and to be used by the defendant itself, as distinct from any of its controlled or subordinate companies. If Krysienski was hurt while laboring on any of these portions of machinery, it is admitted that the statute was applicable. In Pittsburgh, etc., Co. v. Glinn, 219 F. 148, 135 C. C. A. 46, the court said: 'Where the facts show the case may well have been within the statute, the initial burden is satisfied, and it is for the defendant to show the contrary.' We agree with this ruling. Applying it to the present cause, the plaintiff below showed circumstances produced by the orders or business customs of the Erie Company, to which the statute could apply; the burden of proof then lay on the defendant below to show inapplicability. Such burden admittedly has not been borne."

We are not able to distinguish the facts in the two cases above cited from the facts in the present case, and therefore, upon their authority, affirm the judgment.

HOUGH, Circuit Judge, dissents, being of opinion that there was not enough evidence to show interstate operation, even to the jury, much less to justify a direction of verdict.